**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HAROLD K. BRANCH, | | |
| Plaintiff, | | No. 1:23-CV-05278 |
| v. | | Judge Edmond E. Chang |
| KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, | | |
| Defendant. | | |

**MEMORANDUM OPINION AND ORDER**

Harold Branch worked for the U.S. Customs and Border Protection agency, which is part of the Department of Homeland Security. R. 33, DSOF ¶ 4; R. 33-1, Def.'s Exh. 1, Def.'s Answer to Compl. ¶¶ 2–4.[1] After the government terminated Branch's employment, he sued, alleging discrimination and a hostile work environment based on his race (he is African American) and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; discrimination and a hostile work environment based on his age in violation of the Age Discrimination in Employment Act (ADEA) of 1967, 29 U.S.C. § 621 *et seq.*; and retaliation in violation of both statutes. R. 1, Compl. ¶¶ 74–120. The government moves for summary judgment on all claims. R. 31, Def.'s Mot. For the reasons set forth below, because there is no

---

[1] Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number. The current Secretary of the Department of Homeland Security is substituted in as the named defendant under Civil Rule 25(c). This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331.

genuine factual dispute that would allow a reasonable jury to find for Branch, the government's motion is granted.

## I. Background

In deciding this summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In May 2018, the Customs and Border Protection agency (often called CBP) hired Branch as the Fines, Penalties and Forfeitures Officer for the Area Port of Chicago. DSOF ¶ 7; R. 33-2, Def.'s Exh. 2, Notif. of Personnel Action at 1. CBP imposed a one-year probationary period on Branch, during which his employment could be terminated at any time for deficient performance or conduct. DSOF ¶ 8; Notif. of Personnel Action at 2. Matthew Davies, the Area Port Director for Chicago, supervised Branch until February 2019, when Davies moved to another role. DSOF ¶ 14; R. 33-4, Def.'s Exh. 4, Branch Dep. at 36:1–4. In March 2019, Larry Panetta became Acting Area Port Director and Branch's supervisor. DSOF ¶ 14; Branch Dep. at 36:5–7; R. 33-8, Def.'s Exh. 8, Panetta Dep. at 14:8–11. Branch, in turn, supervised a team of 17 individuals. DSOF ¶ 13; R. 33-7, Def.'s Exh. 7, Chicago FPF Personnel at 1; Branch Dep. at 27:18–22.

In his position at CBP, Branch directed the Area Port's Fines, Penalties and Forfeitures and Seized Property programs. DSOF ¶ 11; R. 33-5, Def.'s Exh. 5, Position Description at 1. One of Branch's key responsibilities was to ensure that the Chicago Area Port stored all seized property according to Homeland Security policies and procedures. *Id.* The Chicago vault for seized property had longstanding capacity

2

problems; CBP identified the vault as "Red Flag" overcrowded since 2010. R. 38, PSOF ¶ 1; R. 33-11, Def.'s Exh. 11, Davies Memo at 1. In July 2018, about two months into Branch's tenure, personnel from CBP headquarters performed an unannounced inspection of the vault. DSOF ¶ 21; R. 33-13, Def.'s Exh. 13, 1st Vault Inspection Report at 1. The vault earned an "unsatisfactory" rating because the inspection revealed many violations of CBP policy. DSOF ¶ 23; R. 33-14, Def.'s Exh. 14, Dursa Email & Owen Memo at 2. For instance, there were "[n]umerous instances where high risk property was co-mingled with non-high risk property," and "[h]ard narcotics co-mingled with soft narcotics in the same evidence bag or in the same bin." DSOF ¶ 23; 1st Vault Inspection Report at 5.

After the inspection, Branch was tasked with drafting a response and implementing recommendations to improve the vault. DSOF ¶ 25; Dursa Email & Owen Memo at 1. Branch's efforts were stymied, he says, by inadequate staffing, resource shortages, and lack of support from CBP management. PSOF ¶¶ 2–4; R. 33-12, Def.'s Exh. 12, Branch Memo at 1–6; Branch Dep. at 55:6–17. For example, Matthew Dursa—Branch's predecessor as Fines, Penalties and Forfeitures Officer for the Chicago Area Port—said that he would assemble a team to help Branch implement the response plan. R. 37, Pl.'s Resp. to DSOF ¶ 25; Branch Dep. at 57:24–58:16. But Dursa never did so. *Id*. Similarly, CBP policy prevented Branch from accessing the vault without two armed officers present, hindering Branch's ability to enter the vault and address its deficiencies. PSOF ¶ 9; Branch Dep. at 24:23–25.

3

In April 2019, around nine months after the first inspection, CBP headquarters personnel returned unannounced to re-inspect the Chicago vault. DSOF ¶ 28; R. 33-16, Def.'s Exh. 16, 2d Vault Inspection Report at 1. When the inspection occurred, Branch was attending a two-week leadership training program in West Virginia. DSOF ¶ 29; R. 33-17, Def.'s Exh. 17, Branch Training Record at 1; Branch Dep. at 61:14–19. The second inspection revealed that Branch's team had not fixed the vault's deficiencies. DSOF ¶ 31; 2d Vault Inspection Report at 4. Among other issues, high-risk property was still co-mingled with non-high risk property, and hard narcotics were still co-mingled with soft narcotics. *Id.*

In addition to the vault's deficiencies, Branch faced significant interpersonal challenges at CBP. PSOF ¶ 10; Branch Dep. at 38:16–24, 84:12–85:2. Branch struggled to manage several of his supervisees, including one supervisory paralegal specialist who caused conflict with other employees and filed frivolous complaints against Branch and others in the office. PSOF ¶ 12; R. 33-3, Def.'s Exh. 3, Branch Admin. Dep. at 268:9–14; Branch Dep. at 84:12–18. CBP management refused to take corrective action against the specialist or otherwise support Branch's management of personnel. PSOF ¶ 12; Branch Dep. at 86:1–11. For instance, at one point Branch moved the specialist out of her office so that another employee could use the space as part of a reasonable accommodation. Pl.'s Resp. to DSOF ¶¶ 36–37; Branch Dep. at 79:18–25. When the specialist complained, another CBP manager intervened and required Branch to move her back into the office, undermining Branch's authority. Pl.'s

4

Resp. to DSOF ¶¶ 36–37; Branch Admin. Dep. at 189:20–190:16; Branch Dep. at 80:2–15.

What's more, when Panetta became Branch's supervisor, he treated Branch in a rude and belittling manner. PSOF ¶ 10; Branch Admin. Dep. at 214:24–215:3; Branch Dep. at 111:18–112:14. Panetta turned his back on Branch in meetings, ignored his requests for additional resources and staffing, and gave directions to Branch's supervisees that contradicted Branch's instructions. PSOF ¶¶ 10–11, 13; Branch Admin. Dep. at 207:5–10, 208:10–14; Branch Dep. at 75:20–25, 111:23–112:14, 124:16–24. Panetta also restricted Branch's ability to access certain floors of the office building. PSOF ¶ 13; Panetta Dep. at 58:3–7.

In early May 2019, Branch compiled a 300-page binder to document the problems in his department, including the lack of resources and personnel problems. PSOF ¶ 14; R. 33-23, Def.'s Exh. 23, Binder at 1. Branch submitted this binder to Panetta. PSOF ¶ 14; Branch Dep. at 126:9–13. A few weeks later, Panetta sent a letter notifying Branch that his employment was terminated. PSOF ¶ 16; Branch Dep. at 128:18–25. The letter asserted that Branch's performance had been inadequate, citing the vault's failure of the second inspection and Branch's inability to manage his team. DSOF ¶¶ 49–50; R. 33-24, Def.'s Exh. 24, Termination Letter at 1–2.

Branch then filed a complaint with the Equal Employment Opportunity Commission alleging retaliation, a hostile work environment, and discrimination based on race, age, and sex. R. 1, Pl.'s Exh. A, EEO Complaint. Branch received a Right to

Sue letter in May 2023 and filed suit against DHS in August 2023. R. 1, Pl.'s Exh. B, DHS Final Order at 4–5; *see generally* Compl.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

6

### III. Analysis

### A. Race and Age Discrimination

Title VII makes it unlawful for an employer to discharge employees because of their race. 42 U.S.C. § 2000e-2(a)(1). The ADEA likewise makes it unlawful to discharge employees because of their age (so long as the employee is at least 40 years old). 29 U.S.C. §§ 623(a)(1), 631(a). Under both statutes, a plaintiff may resist a summary-judgment motion in one of two ways. *See Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 960 (7th Cir. 2021).

First, he may satisfy the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first establish a prima facie case of discrimination by showing that "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Igasaki*, 988 F.3d at 957. Then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. *Id.* If the employer does so, then the burden shifts back to the plaintiff to show that the employer's proffered reason was pretextual. *Id.*

Second, even if a plaintiff cannot satisfy the *McDonnell Douglas* framework, he may defeat a summary-judgment motion by offering circumstantial evidence sufficient for a reasonable factfinder to conclude that he was fired because of his

protected status. *Id.* at 957–58; *see Ortiz v. Warner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Here, under either approach, Branch's race- and age-discrimination claims cannot survive summary judgment, even when the evidence is viewed in his favor.[2] Under the *McDonnell Douglas* framework, Branch has failed to establish a prima facie case of discrimination. Yes, he satisfies the first and third elements of a prima facie case because he is African American (and for the ADEA claim, he was over the age of 40), and his employment was terminated. DSOF ¶¶ 4–5, 47; Branch Dep. at 28:1–8, 128:25. But the parties dispute the second element, that is, whether Branch met his employer's legitimate expectations. It turns out, however, that the Court need not opine on the second element because Branch fails to satisfy the fourth: he does not identify similarly situated employees outside of his protected class who received better treatment from DHS.

"All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (cleaned

---

[2]Branch also brought a sex-discrimination claim, but he fails to cite any evidence of sex discrimination or even mention this claim in his response brief or accompanying statement of facts. *See generally* R. 36, Pl.'s Resp.; PSOF. Thus, summary judgment is entered against the sex discrimination claim.

up).[3] Although this element is flexible—the proposed comparator need *not* be an exact match—"[i]n the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 368–69 (cleaned up).

Here, Branch proffers two employees as comparators; both previously served as the Fines, Penalties and Forfeitures Officer for the Area Port of Chicago: Matthew Dursa and Amelia Castelli. Pl.'s Resp. at 6. He argues that, like him, both of these officers failed to correct deficiencies in the Chicago vault, but unlike him, neither lost their job. *Id.* The problem, however, is that Branch provides no evidence to establish that either of the former officers were similarly situated to him. Whether the lack of evidence arises from a failure to deploy the tools of discovery or some other reason, the factual gap is insurmountable.

First, on Amelia Castelli, Branch failed to provide evidence even about Castelli's age or race—besides an assertion in his response *brief* that she is not African American—let alone her performance record at CBP. *See* Pl.'s Resp. at 6. He has thus failed to establish that he and Castelli are similarly situated. *See McDaniel*, 940 F.3d at 369 (holding that plaintiff failed to identify similarly situated individuals for an

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

age-discrimination claim because he did not provide their work history, performance reviews, or ages).

Branch also fails to show, even giving him the benefit of reasonable inferences, that Matthew Dursa is a proper comparator. Yes, Branch offers evidence that Dursa—a white man—previously held Branch's position, failed to correct deficiencies with the Chicago vault, and did not lose his job. Branch Dep. at 48:12–13, 116:9–18, 117:2–5. But Branch failed to provide sufficient evidence to show that Dursa was similarly situated in several important ways. For instance, there is no evidence that *Panetta*, the supervisor who fired Branch, ever supervised Dursa. Indeed, Panetta only became Acting Area Port Director partway through Branch's tenure at CBP. Panetta Dep. at 14:8–14. This suggests that Dursa and Branch are not similarly situated. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (holding that employees were not similarly situated to plaintiff, in part because there was no evidence they reported to the same supervisor).

Also, the evidence shows that Branch and Dursa were situated differently—for a legitimate reason—when it came to the performance standard against which they were measured. Branch was a probationary employee when he was fired, Notif. of Personnel Action at 2–3, and thus subject to stricter performance standards than non-probationary employees. There is no evidence that Dursa was a probationary employee when he served in the same role (and when he voluntarily left the position). *See Steinhauer v. DeGolier*, 359 F.3d 481, 484–85 (7th Cir. 2004) (holding that two

10

employees were not similarly situated because one "was still on probation" whereas the other was not).

Branch also failed to produce evidence to establish that Dursa's work performance was similar to his own. Although Branch introduced general evidence that the vault had deficiencies when Dursa was in charge, *see* Davies Memo at 1, Branch did not introduce more specific and concrete evidence, such as the number of inspections failed during Dursa's tenure, that would establish Dursa performed similarly to Branch. *See McDaniel*, 940 F.3d at 369 (holding that plaintiff lacked evidence to show that other employees were similarly situated, such as their work history or performance reviews); *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 896 (7th Cir. 2018) (same). What's more, the government offered evidence, in the form of the termination letter issued by Panetta, that described other performance issues beyond the vault—namely, Branch's failure to manage personnel on his team. Termination Letter at 2. There is no evidence that Dursa's supervisor believed that Dursa presented this performance problem. *See Gates*, 513 F.3d at 691 (holding that plaintiff is not similarly situated to other employees because there is no evidence they engaged in the same amount or type of misconduct as plaintiff). Given these differences, even viewing the evidence in Branch's favor, he has failed to establish that Dursa is a proper comparator. With that element missing from the prima facie case of discrimination, Branch has not successfully invoked the *McDonell Douglas* framework to resist summary judgment. *Igasaki*, 988 F.3d at 957–60.

11

Branch also fails to survive summary judgment under the second approach—that is, by relying on record evidence that raises a reasonable inference of discrimination. He first points to various interpersonal conflicts with Panetta, other CBP managers, and his supervisees as circumstantial evidence of discrimination. PSOF ¶¶ 10–13; Pl.'s Resp. to DSOF ¶¶ 36–37; Branch Admin. Dep. at 189:20–190:16, 207:5–10, 208:10–14, 268:9–14; Branch Dep. at 75:20–25, 80:2–15, 84:12–18, 111:23–112:14, 124:16–24. But these anecdotes are insufficient to support a discrimination claim without any evidence suggesting the conflicts were due to Branch's *race* or *age*. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 462 (7th Cir. 2014). Beyond his own mere speculation, Branch offers no evidence to connect the interpersonal struggles with his race or age. *See* Branch Dep. at 38:22–24. For example, there are no hints or suggestions of racially tinged or age-based remarks. So Branch fails to offer evidence sufficient for a reasonable jury to conclude that the government discriminated against him because of race or age. The government is entitled to summary judgment on the race- and age-discrimination claims.

## B. Hostile Work Environment

A hostile work environment based on an employee's race is a form of race discrimination in violation of Title VII. *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813–14 (7th Cir. 2022). For age discrimination, the Seventh Circuit has "assumed—without deciding—that a hostile work environment claim can be brought under the ADEA." *Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022). To prevail on a hostile work environment claim, "a plaintiff must show that (1) he was subject to unwelcome

12

harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability." *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019) (cleaned up).

Branch alleges that Panetta created a hostile work environment by turning his back on Branch in meetings, ignoring his requests for more resources, offering contradictory instructions to Branch's supervisees, and restricting Branch's ability to access certain facilities. Pl.'s Resp. at 11–13. But Branch's hostile work environment claims fail for the same reason as his discrimination claims: he offers no evidence that Panetta's behavior was based on Branch's race or age. "Although a connection between the harassment and the plaintiff's protected class need not be explicit, there must be *some* connection. …" *Paschall*, 28 F.4th at 814 (cleaned up). Again, Branch offers merely speculative testimony that Panetta acted based on Branch's race. *See* Branch Dep. at 38:22–24. Also, Branch offers no evidence whatsoever to suggest that Panetta's behavior was based on his age. This gap in the factual record is insufficient to survive summary judgment. *See Paschall*, 28 F.4th at 814 (holding that mere assertions based on plaintiff's subjective interpretations of defendant's behavior are insufficient to show alleged harassment was connected to race).[4] The hostile-environment claims must be dismissed.

---

[4] Branch also does not present adequate evidence to suggest that Panetta's behavior was sufficiently severe or pervasive to create a hostile work environment. *See Patton v.*

### C. Retaliation

Title VII and the ADEA also protect individuals from retaliation for complaining about race- or age-based discrimination. 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d). To establish a prima facie case of retaliation, "a plaintiff must show that a reasonable jury could find that (1) he engaged in statutorily protected activity; (2) his employer took a materially adverse action against him; and (3) the adverse action was caused by the protected activity." *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021).

Here, even giving Branch the benefit of reasonable inferences, no jury could find that he engaged in protected activity, which is the first element of a retaliation claim. Branch argues that he engaged in protected activity when he submitted a 300-page binder to Panetta shortly before he was fired. Pl.'s Resp. at 9–10. The binder articulated complaints about resource shortages, systemic deficiencies within Branch's department, and interpersonal conflicts with Branch's team members. PSOF ¶ 14; Binder at 1–6. But complaints about resource shortages and departmental deficiencies do not relate to Title VII's protections, and are thus not protected activity. *See Miller*, 20 F.4th at 1155. Branch's complaints about interpersonal conflicts are not protected activity, either. "Merely complaining in general terms about

---

*Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (holding that a supervisor who treated plaintiff in a rude manner, ignored plaintiff's suggestions, and failed to keep plaintiff informed about work changes did not engage in conduct "so severe or pervasive as to alter the conditions of her employment in a significant way"). But the Court need not opine further on this element because Branch fails to show that Panetta's behavior was based on Branch's race or age.

discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). The excerpts of the binder produced at summary judgment do not include any complaints that Branch experienced discrimination or a hostile work environment based on his race, age, or any other protected characteristic. *See* PSOF ¶ 14; Binder at 1–6.

Moving away from the binder alone, Branch points to his deposition, during which he testified that the binder contained complaints about race discrimination. PSOF ¶ 14; Branch Dep. at 127:15–18. But for some unknown reason, Branch did not introduce excerpts from the binder that substantiate his deposition testimony. *See* Binder at 1–6. And he offers no further details about those complaints. Without a more specific and concrete factual basis, Branch's testimony amounts to a mere assertion of protected activity, which in turn is insufficient to overcome a summary judgment motion. *See Osborn v. JAB Mgmt. Servs., Inc.*, 126 F.4th 1250, 1258 (7th Cir. 2025 ("Conclusory evidence offered without a factual foundation is insufficient [to overcome summary judgment]."). Because Branch fails to offer enough evidence for a jury to find that he engaged in protected activity, there is no need for the Court to opine on the other elements. Branch's retaliation claim cannot survive summary judgment.

15

## IV. Conclusion

The government's motion for summary judgment, R. 31, is granted. The case is dismissed with prejudice and final judgment shall be entered.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 24, 2025